# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 17-cr-10328-WGY** |
| | ) | |
| **JAMES RAMIREZ** | ) | |
| | ) | |

## DEFENDANT'S EXPEDITED MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. §3582(c)(1)(A)

Defendant, James Ramirez, respectfully moves this Court for an order reducing his sentence based on the "extraordinary and compelling reasons" discussed below, pursuant to the recently amended 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Ramirez is 57 years old. He suffers from diabetes with nephropathy, hypertension, and high cholesterol, and is currently incarcerated in a BOP facility with at least two acknowledged COVID-19 inmate cases and nine staff cases, and where there is minimal ability to take protective measures. This Court sentenced Mr. Ramirez to 66 months in custody. His scheduled release date is April 29, 2022. Accordingly, granting this order would reduce Mr. Ramirez' sentence by two years. Should the Court grant this motion, Mr. Ramirez has a stable residence to return to with his long-time friend, Concetta Como. Ms. Como resides in Boston. Mr. Ramirez also has MassHealth.

We respectfully ask the Court to consider this motion on an expedited basis.

## STATEMENT OF FACTS

On November 15, 2017, Mr. Ramirez pled guilty to the two-count indictment charging him with conspiracy to distribute fentanyl and being a felon in possession of a firearm. On February 20, 2020, the Court sentenced him to 66 months in prison and placing him on

supervised release for 5 years (Docket Entry No. 108.). Mr. Ramirez was recently moved to MDC Brooklyn. His release date is April 29, 2022. This date does not take into account halfway house placement Mr. Ramirez will get. In counsel's experience, the bureau of prisons will most likely give Mr. Ramirez 6 months of halfway house time; there by moving up his release from prison to sometime in October or November 2021.

## I. The COVID-19 Crisis.

The novel coronavirus that causes COVID-19 has led to a global pandemic. As of April 13, 2020 there were more than 1,870,076 reported COVID-19 cases throughout the world and more than 22,146 deaths in the United States.[1] The number of COVID-19 cases in the United States is expected to grow exponentially. Projections range from 100,000 to 200,000 deaths in the United States in the best case scenario, to as many as 1.5 million deaths in the most severe scenario.[2]

New York is currently at the epicenter of the coronavirus pandemic.[3] As of April 9, 2020, there were more than 149,401 positive cases in New York State with more than 84,373 of those cases being in New York City.[4] As of April 9, there have been 6,268 deaths in New York

---

[1] https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467 b48e9ecf6 (last visited Apr. 13, 2020). These numbers rise significantly every day.

[2] See *Dr. Deborah Birx Predicts Up To 200,000 Deaths "If We Do Things Almost Perfectly"* NBC News, Mar. 30, 2020 https://www.nbcnews.com/news/us-news/dr-deborah-birx-predicts-200-000-deaths-if-we-do-n1171876 ; Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths*, New York Times (Mar. 13, 2020) https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html

[3] New York Becomes 'Epicenter' of Coronavirus Pandemic, Politico New York Health Care (March 25, 2020), at https://www.politico.com/states/new-york/newsletters/politico-new-york-health-care/2020/03/25/new-york-becomes-epicenter-of-coronavirus-pandemic-333669.

[4] See New York State website, available at https://coronavirus.health.ny.gov/county-county-breakdown-positive-cases.

from COVID-19.[5] (Counsel drafted the bulk of this motion on April 9, 2020. The number of COVID-19 cases and deaths has risen dramatically just in the last 4 days). New York health officials estimate that the number of hospitalizations in New York State will double every two days over the course of the next two to three weeks.[6] This reality has forced drastic measures: On March 20, 2020, Governor Andrew Cuomo ordered 100 percent of all non-essential workers to remain home, effectively shuttering New York State's entire economy.[7]

　　　As surely as New York State is the current epicenter of the crisis, state and federal prison systems located in New York are uniquely vulnerable. Prisons are environments, much like cruise ships or nursing homes, in which the COVID-19 virus can easily gain a foothold and, when it does, spread rapidly. *See* Craig McCarthy, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* N.Y. Post (Mar. 19, 2020) ("[W]e cannot change the fundamental nature of jail. We cannot socially distance dozens of elderly men living in a dorm, sharing a bathroom. Think of a cruise ship recklessly boarding more passengers each day. . . . Please let as many out as you possibly can."); Jennifer Grannerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Coronavirus*, The New Yorker (Mar. 20, 2020); Megan Flynn, *Top Doctor at*

---

[5] See COVID-19 Tracker, available at https://www.bing.com/covid/local/newyork_unitedstates and New York State, Department of Public Health, https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n

[6] *Coronavirus Map: Tracking the Global Outbreak*, New York Times (Mar. 25, 2020) available at https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html

[7] Keshia Clukey and Henry Goldman, *Cuomo Orders 100% of Nonessential N.Y. Workforce to Stay Home*, Bloomberg News (Mar. 20, 2020), available at https://www.bloomberg.com/news/articles/2020-03-20/n-y-gov-cuomo-100-percent-of-workforce-must-stay-home.

*Rikers Island Calls the Jail a 'Public Health Disaster Unfolding Before Our Eyes*' Washington Post, (Mar. 31, 2020).

Virtually all of the precautionary measures are designed to keep people out of crowded places and to require "social distancing" to lessen the spread of the virus because it is highly contagious. The virus passes through coughing and by contact with surfaces. It "can remain viable and infectious in aerosols for hours and on surfaces up to days."[8] However, the recommended measures for mitigating the spread of COVID-19 are not readily available for incarcerated inmates or those who must interact with them. Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. Current CDC recommendations are for gatherings of no more than 10 people and that each person should remain at a distance of at least six feet from every other person.[9] Implementing this guidance in congregate settings where people must share sleeping areas, dining halls, bathrooms, showers and other common areas, is often difficult, if not impossible. In addition to the increased opportunities for transmission, there are reduced opportunities to apply necessary hygiene measures, as jails and prisons are often under resourced and ill-equipped.

Recognizing this, New York City Mayor Bill de Blasio "has been pushing prosecutors

---

[8] Neeltje van Doremalen, et. al, Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, New England J. Med., (March 17, 2020), available at nejm.org/doi/10.1056/NEJMc2004973.

[9] Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, Center for Disease Control and Prevention, 3 (Mar. 12, 2020) available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf. See also Lisa Maragakis, "Coronavirus, Social Distancing, and Self-Quarantine," John Hopkins Univ. (last accessed March 21, 2020) https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

and judges to release as many inmates as possible, after dire warnings from public defenders and jail health officials about the toll the disease could take inside lockups." *See* Jan Ransom and Alan Feuer, *'We're Left for Dead': Fears of Virus Catastrophe at Rikers Jail*, New York Times (Mar. 30, 2020). *See also* Bernadette Hogan, *Cuomo Orders 1,100 Parole Violators Released from Jails Over Coronavirus Concerns*, N.Y. Post (Mar. 27, 2020). Although hundreds of inmates in New York City jails have been released, the rate of infection has continued to climb.[10]

The federal prison system is not immune, as many voices in Congress have recognized.[11] Our nation's jails and prison systems do not provide adequate medical care in the best of times, and the federal system is no exception.[12] As of April 13, 2020, 10 federal inmates within the

---

[10] For example, as of April 8, 2020 287 inmates and 441 employees inside the New York City Department of Correction system have tested positive, which "yields a rate of infection within the city's correctional system of 6.6 percent, more than seven times higher than that of New York City at large and nine times higher than New York State." See Asher Stockler, More Than 700 People Have Tested Positive for Coronavirus on Riker's Island, Including Over 440 Staff, Newsweek (Apr. 8, 2020) available at https://www.newsweek.com/rikers-island-covid-19-new-york-city-1496872.

[11] Legislators have been calling on the Department of Justice to "do all they can to release as many people as possible who are currently behind bars and at risk of getting sick." *See* March 19, 2020 Letter from U.S. Reps. Jerrold Nadler & Karen Bass to Attorney General William P Barr ("With large numbers of people living in close proximity to one another, many of them elderly or living with chronic diseases, DOJ must act now to save lives. Accordingly, we urge you to put in place measures to ensure that both the flow of prisoners into federal facilities is slowed significantly and that prisoners who can and should be released are released forthwith. We cannot wait any longer to take action."); *see also* March 19, 2020 Letter from Senator Kathleen Harris to BOP Director Michael Carvajal (noting that "[e]merging research has demonstrated how dangerous coronavirus is for the elderly and those with underlying conditions and compromised immune systems" and urging BOP to "tak[e] reasonable steps to reduce the incarcerated population and guard against potential exposure to coronavirus") Available at https://www.harris.senate.gov/imo/media/doc/Harris%20Letter%20to%20Carvajal%20(3.19).pdf

[12] *See* U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf

BOP system have already died.[13] As of April 13, 2020 the Bureau of Prisons website confirms that 352 federal inmates (*including four inmates at MDC-Brooklyn*) and 189 staff members (*twelve in Brooklyn*) have tested positive for COVID-19.[14] In addition BOP informed congressional staff at an April 7, 2020 briefing that they had the following "open" cases, which they defined as "suspected, presumed positive, or clinically confirmed":

- 456 people in isolation (symptomatic, but not necessarily tested);
- 3,850 inmates in quarantine (as of April 7)
- 192 quarantined at RRCs (as of April 7).[15]

However, there are significant reasons to believe that even these numbers drastically underestimate the scope of the problem, as testing is not generally available inside the prison system. A union representing BOP staff has filed an "imminent danger report" with the United States Department of Labor Occupational Safety and Health Administration ("OSHA") alleging

---

(finding that the BOP experienced chronic medical staff shortages and failed to take adequate measures to address them, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions); U.S. Dep't of Justice Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf (finding that BOP facilities and services, including medical services, were inadequate to meet the needs of an aging prison population leading to delays in medical treatment for prisoners with acute and chronic heart and neurological conditions, who wait an average of 114 days to see medical specialists.); David Patton, *Statement from Federal Defenders of New York*, Federal Defenders of New York (Mar. 8, 2020), https://federaldefendersny.org/about-us/news/statement-from-federal-defenders-of-new-york.html.

[13] *See* Keegan Hamilton, *Third Inmate Dies from COVID-19 at Louisiana Prison as Entire Federal System Goes on Lockdown*, Vice News (Apr. 2, 2020) available at https://www.vice.com/en_us/article/5dmend/second-inmate-dies-from-covid-19-at-louisiana-prison-as-entire-federal-system-goes-on-lockdown *See also* Kimberly Kindy, An Explosion of Coronavirus Cases Cripples a Federal Prison in Louisiana, Washington Post (Mar. 29, 2020).

[14] https://www.bop.gov/coronavirus/ (last visited Apr. 13, 2020). BOP reports that 40 BOP facilities and 9 RRCs nationwide have been affected. *Id.*

[15] Information regarding the briefing provided by BOP to Congressional staff on April 7 was information provided by Federal Defender Sentencing Resource Counsel.

that the BOP is engaging in actions which are proliferating the spread of COVID-19 including a) directing staff who have come into contact with individuals who show systems of COVID-19 to report to work and not self-quarantine; failing to introduce workplace controls to mitigate or prevent exposure or further exposure to the virus; failing to modify operations to minimize contact; and failing to provide staff with the proper masks to staff. *See* Joe Davidson, *Unions for Prison, VA Workers File 'Imminent Danger" Reports about Coronavirus Condition*s, Washington Post, (Apr. 9, 2020).[16]

## II. Conditions at the Metropolitan Detention Center – Brooklyn.

On March 27, 2020 civil rights lawyers and Federal Public Defenders filed a lawsuit in the United States District Court for the Eastern District of New York demanding the immediate release of 537 inmates that MDC-Brooklyn had classified as "vulnerable" to COVID-19.[17] *See* Class Action Petition Seeking Writ of Habeas Corpus Under 28 U.S.C. § 2241, *Chunn v. Edge*, No. 20-cv-01590-RPK (filed Mar. 27, 2020). Facts regarding the recent conditions at MDC-Brooklyn are taken from that complaint and its supporting materials. The declaration of Attorney-in-Charge for the Eastern District of New York at the Federal Defenders of New York Deirdre Von Dornum is attached as Exhibit A will be referred to as "VD ¶ _." These materials detail, among other facts, representations made by MDC-Brooklyn to both the Federal Defender Office and the court system, as well as observations by clients within the facility.

The Metropolitan Detention Center-Brooklyn is a massive pretrial detention facility,

---

[16] A copy of the report is available at
https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf.

[17] According to the complaint, this list was provided by BOP on March 23, 2020. Mr. Ramirez had not moved to the facility at that time.

housing approximately 1740 people. The majority of the people detained are housed in small two-man cells (designed to hold a single person) with a shared toilet. Some people are confined in large, dormitory style settings with as many as 70 people sharing a large sleeping space and beds spaced only 3 to 5 feet apart. VD 26.[18] Windows in the units do not open. Incarcerated people cannot go outside. JG 16. People confined at MDC must frequently share or touch objects used by others. Toilets, sinks, and showers are shared, without disinfection between each use. Phones and computer terminals are all shared by numerous people, without disinfection between each use. VD 27-28. Inmates are responsible for sanitizing the housing unit common areas, and frequently lack adequate cleaning supplies to do so. VD 32. Food preparation (by inmates) and service (by inmates) is communal with little opportunity for surface disinfection. Meals are eaten together in large groups. VD 29.

Importantly, there is no separate medical unit or facility at MDC-Brooklyn for ill inmates. Unlike many Federal Correctional Institutions and even Rikers' Island, MDC has no physical space in which an ill inmate can convalesce that is separate from other inmates. VD 41. There are only three doctors available at MDC to care for all 1700 inmates. None of these doctors specialize in infectious diseases. VD 42. It goes without saying that MDC cannot intubate inmates on site and has no access to ventilators. VD 39-40. As detailed below, the Warden represented that, as of March 20, MDC had only nine COVID-19 test kits. VD 38.

The complaint details that since early March, the Federal Defenders have engaged in extensive efforts to get the MDC to address the risks associated with the spread of COVID-19, to little avail. VD 4-6. Federal Defenders requested a number of measures, including increased sanitation, a comprehensive testing protocol for incarcerated people and staff, and a plan for

---

[18] *See* "Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impact on Inmates," OIG Report (Sept. 2019) (describing housing units).

isolating anyone who tests positive at a hospital or other medical facility. VD 4.

MDC officials responded to these concerns for the first time on March 11, 2020, when at the request of the Chief Judge of the Eastern District of New York, they attended a meeting of the EDNY Facilities committee. At that meeting Associate Warden Cruz indicated that the MDC was still receiving guidance from national BOP leadership as to how to handle the coronavirus epidemic. In response to specific questions, Associate Warden Cruz stated:

a. the facility could not make public its plans or protocols for coronavirus because of security considerations;

b. there was no testing protocol in place, except for the temperature readings of those people being brought to court (by order of the Chief Judge) and the facility did not anticipate having a testing protocol;

c. Staff were being asked to self-report if they had traveled to what were then the designated hotspot countries or had been exposed to someone known to have coronavirus;

d. It was unclear if staff who presented with risk factors and were sent home would be on paid or unpaid leave, because that is a national BOP decision;

e. the MDC had placed soap in the lobby bathroom for visitors, intended to provide a bar of soap to each inmate and to ask the inmate orderlies to increase cleaning, but could not provide hand sanitizer to inmates, and neither staff nor visitors would be allowed to bring in hand sanitizer;

f. the MDC did not yet know where any incarcerated person who tested positive would be placed;

g. the MDC did not believe it would be feasible to use the empty floors in the East (or "old") building of the MDC to house people who were symptomatic or who tested positive;

h. the MDC did not intend to do a lockdown on social or legal visitation;

i. the MDC would continue to accept new arrests;

j. the MDC would screen new arrests for symptoms of COVID-19 and

k. would ask newly arriving inmates if they had traveled recently outside the United States;

l. the MDC had no plans to move vulnerable inmates but would make an

effort to identify which inmates fell under the CDC's definition of vulnerable. VD 6.

Beginning on March 14, 2020 and continuing through March 19, 2020, Federal Defenders spoke to over a hundred clients by telephone. The clients uniformly observed that there had been no change in sanitation practices at the facility; no doctors came to the units to check on anyone, and that inmates understood that staff are being given temperature checks as they entered the facility, but that staff were not wearing gloves, masks, or other protective gear within the facility. VD 9.

On March 20, 2020, the Warden of MDC, Derek Edge, represented to the Chief Judge of the Southern District of New York that:

a. 537 inmates at the MDC fell into categories identified by the CDC as particularly vulnerable to COVID-19;

b. the facility had 9 nasal swab test kits;

c. one inmate had been swabbed at the facility and his test results came back negative;

d. two inmates had been sent to the hospital for testing: one was sent back without being tested; the other was back in the facility and test results were awaited; and

e. staff were being screened for elevated temperatures as they entered the facility and sent home if they had a temperature over 100.4 degrees Fahrenheit based on a temporal thermometer.

VD 11.

On March 21, 2020 Federal defenders learned from Twitter that an inmate at MDC-Brooklyn had tested positive for COVID-19. VD 12. They asked MDC whether the inmate was hospitalized or being held at the facility and what steps were being taken to identify inmates and staff who had been exposed to the inmate who tested positive. VD 12. The MDC informed Federal Defenders that the inmate was back at the facility in isolation in an unspecified location

and that appropriate steps were being taken to identify inmates and staff who had been exposed to the inmate. The MDC stated that the unit on which the inmate who had tested positive had been housed would be locked down over the weekend, as would several other units, and the intake unit would undergo a "deep clean" before being re-opened to inmate movement. VD 12.

Federal defenders subsequently learned that the inmate who tested positive had been housed on the "intake" unit on the 4th floor for approximately one week before testing positive.[19] At the time of his admission to the institution he was asymptomatic. He developed symptoms within three days of his admission. VD 13. The inmate had contact with many inmates and staff on the intake unit, and subsequently inmates who were in contact with him were transferred to other units within the facility. *Id.* New inmates from other institutions who were in transmit to their designated facilities were added to the intake unit on March 20, 2020, the day before he tested positive. Federal Defenders also learned that no professional staff or cleaners sanitized the intake unit after the inmate tested positive, but instead inmate orderlies were sent to clean the unit with the same cleaning supplies they regularly used and were provided insufficient gloves and masks. *Id*.

On March 26, 2020, the Federal Defenders was informed by Congresswoman Nydia Velazquez's office that three staff members at the MDC have tested positive and a number of others are symptomatic. VD 17.

On April 1, 2020 at a hearing in federal court before Judge Rachel Kovner of the Eastern District of New York, MDC officials admitted that only two additional inmates had been tested for COVID-19. *See* Frank G. Runyeon, *Prison Says It Tested Just 2 More Inmates Despite Virus*

---

[19] Mr. Ramirez's recent transfer to the facility increases the likelihood that he would have either crossed paths with the infected inmate, or with others who were in contact with him.

*Cases*, Law360 (Apr. 1, 2020).[20]

**LEGAL ARGUMENT**

18 U.S.C. § 3582(c)(1)(A) permits a defendant to file a motion with the Court following an adverse determination of an inmate's request that the BOP file a motion to modify the inmate's sentence, or 30 days from BOP's receipt of a request that it file such a motion. On April 2, 2020 counsel transmitted Mr. Ramirez's request to the warden of MDC Brooklyn via email. *See* Exhibit B. On April 4, 2020 counsel received a response that the email had been forwarded to the appropriate department. In light of the time-sensitive nature of this application, Mr. Ramirez is filing this motion now so that the Court has an opportunity to review the matter as quickly as possible.

**I.     This Court Has The Authority to Resentence Mr. Ramirez Under 18 U.S.C. § 3582(c)(1)(A)(i) for the "Extraordinary and Compelling Reasons" Created By The COVID-19 Pandemic and the Prison Conditions Which Prevent Self-Care for a High-Risk Patient.**

Recent changes to the statutory language of 18 U.S.C. § 3582 provide new jurisdiction to federal courts to grant release for extraordinary and compelling reasons. Federal courts may reduce a prisoner's sentence under the circumstances outlined in 18 U.S.C. § 3852(c). Under § 3852(c)(1)(A)(i), a court may reduce a prisoner's sentence "if it finds that" (1) "extraordinary and compelling reasons warrant such a reduction" and (2) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission."

Prior to 2018 only the Director of the Bureau of Prisons ("BOP") could file these kinds

---

[20] Available at https://www.law360.com/newyork/articles/1259489/prison-says-it-tested-just-2-more-inmates-despite-virus-cases?nl_pk=42bade0b-3cf7-4044-84d9-11f6adc34b2f&utm_source=newsletter&utm_medium=email&utm_campaign=newyork&read_more=1

of "compassionate-release motions." *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019).[21] The BOP rarely did so. Although the BOP was first authorized to file compassionate-release motions in 1984, from 1984 to 2013, an average of only 24 inmates were released each year through BOP-filed motions. *See* Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice). According to a 2013 report from the Office of the Inspector General, these low numbers resulted, in part, because the BOP's "compassionate release program had been poorly managed and implemented inconsistently, . . . resulting in eligible inmates . . . not being considered for release, and terminally ill inmates dying before their requests were decided." *Id*. The report also found that the BOP "did not have clear standards as to when compassionate release is warranted and . . . BOP staff therefore had varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release." *Id*.

Against this backdrop, Congress passed and President Trump signed the First Step Act in 2018, a landmark piece of criminal-justice reform legislation that "amend[ed] numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration." *Brown*, 411 F. Supp. 3d at 448 (citing Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1 (2019)). In an effort to improve and increase the use of the compassionate-release process, the First Step Act amended § 3852(c)(1)(A) to allow prisoners

---

[21] The Comprehensive Crime Control Act of 1984 first included the so-called "compassionate release statute" which allowed for a district court to modify a final term of imprisonment after finding the existence of "extraordinary and compelling reasons" only upon motion by the Director of the Bureau of Prisons ("BOP"). 18 U.S.C. § 3582(c)(1)(A)(i); see also P.L. 98-473, 98 Stat 1837 (Oct. 12, 1984). Without such motion, district courts were unable to reduce a prisoner's sentence, even if it concluded that extraordinary and compelling reasons existed to do so. The BOP served as a gatekeeper to a prisoner's road to potential relief and limited the sentencing court's jurisdiction.

to directly petition courts for compassionate release, removing the BOP's exclusive "gatekeeper" role.[22]

The amendment to § 3852(c)(1)(A) provided prisoners with two direct routes to court: (1) file a motion after fully exhausting administrative appeals of the BOP's decision not to file a motion, or (2) file a motion after "the lapse of 30 days from the receipt . . . of such a request" by the warden of the defendant's facility, "whichever is earlier." 18 U.S.C. § 3852(c)(1)(A). These changes gave the "district judge . . . the ability to grant a prisoner's motion for compassionate release even in the face of BOP opposition or its failure to respond to the prisoner's compassionate release request in a timely manner." *United States v. Young*, 2020 WL 1047815, at *5 (M.D. Tenn. Mar. 3, 2020). The substantive criteria of § 3582(c)(1)(A)(i) remained the same.

Congress never defined the term "extraordinary and compelling reasons," except to state that "[r]ehabilitation . . . alone" does not suffice. 18 U.S.C. § 994(t). Rather, Congress directed the Sentencing Commission to define the term. *Id.* The Commission did so prior to the passage of the First Step Act, but has not since updated the policy statement. *See* U.S.S.G. §1B1.13 cmt. n.1(A)-(D). In subsections (A)-(C) of an Application Note to U.S.S.G. §1B1.13, the Commission enumerated three specific "reasons" that qualify as "extraordinary and compelling": (A) terminal illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant

---

[22] *See also United States v. Redd*, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020) ("The First Step Act was passed against the backdrop of documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants."); 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of the First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate release applications.").

is over 65 years old and has served at least ten years or 75% of his sentence; or (C) two family related circumstances: (i) death/incapacitation of the only caregiver for the inmate's children or (ii) incapacitation of an inmate's spouse, if the inmate is the spouse's only caregiver. *See id.* cmt. n.1(A)-(C). The policy statement also added a catchall provision that gave the Director of the BOP the authority to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the other three categories. *Id*. cmt. n.1(D).

Thus, implicitly recognizing that it is impossible to package all "extraordinary and compelling" circumstances into three neat boxes, the Commission made subsections (A)-(C) non-exclusive by creating a catchall that recognized that other "compelling reasons" could exist. *See United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (noting that §1B1.13 never "suggests that [its] list [of criteria] is exclusive"); *United States v. Beck*, 2019 WL 2716505, at *8 (M.D.N.C. June 28, 2019) ("Read as a whole, the application notes suggest a flexible approach . . . [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances.").

The Commission has not updated its policy statement to account for the changes imposed by the First Step Act,[23] and the policy statement is now clearly outdated. The very first sentence of §1B1.13 constrains the entire policy statement to motions filed solely by the BOP. And an Application Note also explicitly confines the policy statement to such motions. See U.S.S.G. §1B1.13 ("Upon motion of the Director of the [BOP] . . . the court may reduce a term of imprisonment . . . ."); *id.* at cmt n.4 ("A reduction under this policy statement may be granted

---

[23] As several courts have recognized, the Commission is unable to update the Sentencing Guidelines because, at the moment, it lacks a sufficient number of appointed commissioners to take this action. *See, e.g., United States v. Maumau*, No. 08-cr-00785, 2020 WL 806121, at *1 n.3 (Feb. 18, 2020).

only upon motion by the Director of the [BOP].”); see also *Brown* at 449 (describing the old policy statement as “outdated,” adding that the Commission “has not made the policy statement for the old [statutory] regime applicable to the new one.”); *United States v. Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. 2020) (describing the old policy statement as “at least partly anachronistic”).

Accordingly, a majority of district courts, including district courts within the First Circuit, have concluded that the “old policy statement provides helpful guidance, [but] . . . does not constrain [a court's] independent assessment of whether ‘extraordinary and compelling reasons’ warrant a sentence reduction under § 3852(c)(1)(A).” *United States v. Beck*, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *see also Brown*, 411 F. Supp. 3d at 451 (“[T]he most natural reading of the amended § 3582(c) . . . is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it.”); *United States v. Fox*, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) (“[D]eference to the BOP no longer makes sense now that the First Step Act has reduced the BOP’s role. I treat the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts.”); *United States v. Bucci,* 409 F.Supp. 1, 2 (D. Mass. 2019) (following *Fox* and holding that “the Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive”); *United States v. Redd*, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020) (“Application Note 1(D)’s prefatory language, which requires a [catchall] determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance. . . . [R]estricting the Court to those reasons set forth in §1B1.13 cmt. n.1(A)-(C) would effectively preserve to a large extent the BOP’s role as

exclusive gatekeeper, which the First Step Act substantially eliminated . . . ."); *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("[T]he dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act."); *Maumau*, 2020 WL at *2-*3 (D. Utah Feb. 18, 2020) (collecting cases).[24]

Thus Court has discretion to assess whether Mr. Ramirez presents "extraordinary and compelling reasons" for his release outside those listed in the non-exclusive criteria of subsections (A)-(C) of the pre-First Step Act policy statement. *See* Memorandum, *United States v. Jeremy Rodriguez*, 03-cr-00271-AB-1 (E.D.P.A. Apr. 1, 2020), at 12 (granting compassionate release due to COVID-19 and holding that the Court had discretion to assess whether the defendant presented "extraordinary and compelling reasons" for his release outside of those listed in the non-exclusive criteria of subsections (A)-(C) of the policy statement and citing *Fox*, 2019 WL 3046086, at *3 for the proposition that "the Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive . . . ."); *United States v. White,* 00-30027-MGM (D. Mass. April 10, 2020)(granting compassionate release, waiving exhaustion requirement, for 52 year old inmate being held at MDC Brooklyn with no significant underlying health issues).

## II.     Extraordinary and Compelling Reasons Exist Here.

Mr. Ramirez's circumstances – particularly the outbreak of COVID-19, his underlying

---

[24] A smaller number of courts have concluded that the Sentencing Commission's policy statement prevents district courts from considering any "extraordinary and compelling reasons" outside of those listed in subsections (A)-(C) of the policy statement. *See, e.g., United States v. Lynn*, 2019 WL 3805349, at *2-*5 (S.D. Ala. Aug. 12, 2019); *United States v. Shields,* 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019); *United States v. Willingham*, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019).

medical conditions that place him at high risk should he contract the disease, the fact that COVID-19 has already made its way into MDC-Brooklyn coupled with the fact that the conditions at MDC-Brooklyn are conducive to the spread of the virus are "extraordinary and compelling" reasons to reduce his sentence.

As a 57 year old who suffers from diabetes and hypertension, Mr. Ramirez is a vulnerable inmate. First, it is clear that coronavirus risks increase with age.[25] More importantly individuals with diabetes and hypertension are at heightened risk. An early World Health Organization report on COVID-19 found that "[i]ndividuals at highest risk for severe disease and death include people . . . with underlying conditions such as hypertension [and] diabetes."[26] While the preliminary overall fatality rate in the report was 3.8%, the fatality rate for people with diabetes was 9.2%. The fatality rate for people with hypertension was 8.4%. *Id.* Recent New York statistics show that the two most common co-morbidities were hypertension and diabetes.[27]

In a recent decision granting compassionate release to an inmate in very similar circumstances to Mr. Ramirez, Judge Anita Brody of the Eastern District of Pennsylvania

---

[25] *See* New Coronavirus Study Reveals Increased Risks from Middle Age, The Guardian (Mar 30, 2020) ("Our analysis very clearly shows that at age 50 and over, hospitalization is much more likely than in those under 50, and a greater proportion of cases are likely to be fatal.")

[26] Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 24, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[27] https://www.usatoday.com/story/news/health/2020/04/07/new-york-coronavirus-deaths-data-shows-most-had-underlying-illnesses/2960151001/ ("And 4,089 of those who died had at least one other chronic disease, the records showed: The leading underlying illness was hypertension, which showed up in 55% of the deaths. Next was diabetes, which was diagnosed in 1,755 deaths, or about 37% of the cases. Other top illnesses found in those who died from coronavirus were hyperlipidemia; coronary artery disease; renal disease and dementia.").

found that the inmate's diabetes, high blood pressure and liver abnormalities constituted "compelling reasons," despite the fact that the BOP classified him at the lowest care level and that the government argued that his conditions were not unusual: "In the absence of a deadly pandemic that is deadlier to those with [the defendant's] underlying conditions, these conditions would not constitute 'extraordinary and compelling reasons.' It is the confluence of COVID-19 and [the defendant's] health conditions that makes this circumstance extraordinary and compelling." *See* Memorandum, *United States v. Jeremy Rodriguez*, 03-cr-00271-AB-1 (E.D.P.A. Apr. 1, 2020), at 15; Similarly, Judge Analisa Torres of the Southern District of New York granted compassionate release to an inmate in similar circumstances to Mr. Ramirez – incarcerated at the MDC. *See United States v. Perez*, 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020) ("extraordinary and compelling reasons" demonstrated by client's medical condition, combined with the limited time remaining on his prison sentence, and the high risk in the MDC posed by COVID-19"). Other courts have also found that COVID-19 presents an extraordinary and compelling reason. *See United States v. Muniz,* 2020 WL 1540325 (Mar. 30, 2020) (granting compassionate release to inmate with end stage renal disease, diabetes, and arterial hypertension and noting that "while the Court is aware of the measures taken by the Federal Bureau of Prisons, new reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); *United States v. Campagna*, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) (holding that Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify to

Defendant's sentence); *United States v. Jepsen*, 2020 WL 1640232 at *5 (D. Conn. Apr. 1, 2020) (inmate who is immunocompromised and suffers from multiple chronic conditions demonstrated "extraordinary and compelling" circumstances); *United States v.Resnick*, 2020 WL 1651508 (S.D.N.Y. Apr. 2, 2020) (inmate with diabetes and end-state liver disease demonstrated "extraordinary and compelling circumstances"); *United States v. Zuckerman*, 2020 WL 1659880 at *5 (S.D.N.Y. Apr. 3, 2020) (Zuckerman's age combined with his diabetes, hypertension and obesity satisfy the "extraordinary and compelling reasons" requirement); *United States v. White,* 00-30027-MGM (D. Mass. April 10, 2020)(granting compassionate release, waiving exhaustion requirement, for 52 year old inmate being held at MDC Brooklyn with no significant underlying health issues).

### III. This Court Can Waive the 30-Day Requirement for Exhaustion of Administrative Remedies Under 18 U.S.C. § 3582(c)(1)(A) Because of the Urgent Risk of Fatal Infection.

Mr. Ramirez filed his petition with the warden via counsel on April 2, 2020. Exhibit B. Under section 3582(c)(1)(A), Mr. Ramirez would ordinarily be required to either wait 30 days following the warden's receipt of his compassionate release request, or exhaust all administrative remedies prior to approaching the Court, whichever happens earlier. *See* 18 U.S.C. § 3582(c)(1)(A). However, the Court may waive these administrative exhaustion requirements, and should do so here. *See, e.g., United States v. Perez*, 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020) (holding that client's undisputed fragile health, combined with the high risk of contracting COVID-19 in the MDC, justifies waiver of the exhaustion requirement); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (exhaustion would be futile for inmate at MDC Brooklyn who had 26 days remaining of imprisonment and suffers from chronic obstructive pulmonary disease and asthma).

Typically a prisoner seeking to alter his conditions of imprisonment generally must exhaust administrative remedies before resorting to judicial intervention, the Court may waive that prerequisite. The First Step Act did not alter this longstanding precedent—both the administrative exhaustion procedure and the circumstances meriting its waiver remain unchanged. *See, e.g., United States v. Bolino*, No. 06-CR-0806 (BMC), 2020 WL 32461, at *1 (E.D.N.Y. Jan. 2, 2020) (under the First Step Act, "the same exhaustion procedure for routine administrative grievances . . . applies to requests for compassionate release."). Indeed, courts throughout the country have continued to waive the administrative exhaustion requirements under the First Step Act, where circumstances warrant. *See Washington v. Bur. of Prison*s, No. 1:19-CV-01066, 2019 WL 6255786, at *2 (N.D. Ohio July 3, 2019) (in addressing motion for recalculation of good time credit under the First Step Act, the court explained that "[t]he failure to exhaust administrative remedies may be excused if seeking administrative remedies would be futile."); *United States v. Walker*, No. 3:10-cr-00298-RRB-1, [Dkt. 110] (D. Or. Feb. 7, 2019) (finding that, although the defendant failed to exhaust administrative remedies, the Court had jurisdiction to order recalculation of defendant's good time credit under the First Step Act and to order defendant's release if his term of imprisonment had expired); see also *Gurzi v. Marques*, No. 18-CV-3104-NEB-KMM, 2019 WL 6481212, at *2 (D. Minn. Oct. 10, 2019) (despite prisoner's failure to exhaust administrative remedies, addressing the merits of prisoner's objections to his designation, in part under the First Step Act, as "the Court observes that it has the authority to proceed to the merits of the case rather than rely on a failure to exhaust when appropriate."); *United States v. White,* 00-30027-MGM (D. Mass. April 10, 2020)(granting compassionate release, waiving exhaustion requirement, for 52 year old inmate being held at

MDC Brooklyn with no significant underlying health issues)[28]

The futility and potentially irreparable harm of requiring Mr. Ramirez to wait a minimum of 30 days to exhaust his administrative remedies are manifest. Mr. Ramirez seeks this emergency relief to avoid contracting COVID-19 at MDC Brooklyn where he has a high risk of infection: "social distancing" is impossible in the crowded facility, and soap, hand sanitizer and disinfectant products are scarce. Waiting for Mr. Ramirez to exhaust his administrative remedies would only compound his risk of exposure to COVID-19. Should he contract the virus while waiting for an administrative response any remedy will come too late— Mr. Ramirez will be in mortal danger, causing him potentially irreparable physical harm, and rendering this compassionate release request utterly moot. *See, e.g., Sorbello v. Laird*, No. 06 CV 948 (JG), 2007 WL 675798, at *3 n.8 (E.D.N.Y. Feb. 28, 2007) (refusing to dismiss petition requesting designation to halfway house "for failure to exhaust administrative remedies" where delay in processing administrative remedies would "result in the irreparable harm of late designation to community confinement"); *Pimentel v. Gonzales*, 367 F. Supp. 2d 365, 371 (E.D.N.Y. 2005) (addressing merits of request for designation to halfway house, where "not only would an administrative appeal be futile, but without immediate relief by this court, Pimentel could suffer irreparable harm," as "[w]ere Pimentel required to pursue administrative remedies prior to bringing this action, he would likely be done serving much, if not all of his entire sentence such that his request would become moot.").

---

[28] Nor is there a colorable argument that the exhaustion requirement under the First Step Act is jurisdictional. Like the administrative exhaustion requirements applicable to § 2241 petitions, and under the PLRA, § 3582(c)(1)(A) "lacks the sweeping and direct language that would indicate a jurisdictional bar rather than a mere codification of administrative exhaustion requirements." *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir. 2003) (quotation marks and citations omitted); *see also Atkinson v. Linaweave*r, No. 13 CIV. 2790 JMF, 2013 WL 5477576, at *1 (S.D.N.Y. Oct. 2, 2013) ("In a case brought pursuant to Section 2241, exhaustion . . . does not go to the Court's jurisdiction to adjudicate the dispute").

In *Perez*, the client submitted his BOP application for sentence modification on March 26 and the Court granted his motion on April 1. Although acknowledging that a number of courts have denied applications for sentence modification under 3582(c)(1)(A) brought on the basis of the risk posed by COVID-19 on the ground that the defendant failed to exhaust his administrative remedies, the Court noted that "in several of those cases, the defendant was not in a facility where COVID-19 was spreading, and in none of them did the defendant present compelling evidence that his medical condition put him at particular risk of experiencing deadly complications from COVID-19. In this case, unlike those, Perez has established that enforcing the exhaustion requirement carries the real risk of inflicting severe and irreparable harm to his health." *Perez*, 2020 WL 1546422 at *3 n.3. Noting that Perez had limited time on his sentence, the Court held that pursuing the administrative process would be a futile endeavor, and would cause him irreparable injury, because "remaining incarcerated for even a few weeks increases the risk that he will contract COVID-19."*Id*. at *3. Similarly, in the case of a defendant incarcerated at MDC-Brooklyn, the court noted that "[e]ven a few weeks' delay carries the risk of catastrophic health consequences for McCarthy. Second, "given the brief duration of Defendant's remaining term of imprisonment, the exhaustion requirement likely renders BOP incapable of granting adequate relief." *McCarthy, supra*, 2020 WL 1698732 at *4.

*United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2, 2020) (finding exhaustion requirement futile when defendant had only 11 days left of sentence); *See also United States v. Jose Marin*, 15-cr-00252-PKC-RML-8 (E.D.N.Y. Mar. 30, 2020) (minute order granting assented-to emergency motion to reduce sentence despite the fact that defendant has not exhausted his administrative remedies);*United States v. Powell*, No. 1:94-cr-316(ESH), ECF No. 98 (D.D.C. Mar. 28, 2020) (finding administrative exhaustion futile, waiving §

3582(c)(1)(A)'s exhaustion requirement, and granting unopposed motion for compassionate

release in light of COVID-19 pandemic and defendant's underlying health issues where

defendant has only three months left of his sentence); In addition, at least one court has found

waiver even when the client's release date was far in the future. *See., e.g., United States v.*

*Zuckerman*, 2020 WL 1659880 at *4 (S.D.N.Y. Apr. 3, 2020) (granting compassionate release,

and finding there was justification for waiving the 30-day exhaustion requirement, noting

"[a]lthough Zuckerman's original release date may be far off, the threat of COVID-19 is at his

doorstep.").

The Bureau of Prisons has known for months of the impending COVID-19 crisis,

creating a further reason to excuse Mr. Ramirez's failure to exhaust all administrative remedies.

The BOP has had ample opportunity to adequately prepare MDC Brooklyn for this emerging

health crisis, which would have obviated the need for Mr. Ramirez's emergency compassionate

release petition.  Because the BOP was on notice of the potential dangers to inmates like him,

Mr. Ramirez should not be required to wait while the BOP takes additional time addressing his

administrative request. *See Basciano*, 369 F. Supp. 2d at 349 (despite failure to exhaust

administrative remedies, because "the BOP ha[d] not addressed [his] request for relief in a timely

fashion," despite "ample opportunity" to do so, the court found that "[t]he administrative appeals

process would thus, in the circumstances of this case, be an empty formality that would risk

exposing Basciano to irreparable harm"). Mr. Ramirez should not be forced to bear the brunt of

the facility's failure to adequately prepare for COVID-19. In these extraordinary circumstances,

the Court should waive the administrative exhaustion requirement in § 3582.  This is particularly

so when it appears that they are not doing any additional testing in order to contain the spread of

the virus. *See, supra* n. 20 *Prison Says It Tested Just 2 More Inmates Despite Virus Cases*

(describing statements made by MDC administrators in a Federal Court hearing on April 1, 2020).

Here, while the 30-day period since the warden's receipt of Mr. Ramirez's request for compassionate release due to the threat of coronavirus infection has not yet passed, this Court can construe the exhaustion requirement as futile given the urgency of this national emergency and rapid spread of the pandemic.[29]

### IV. A Sentencing Reduction is Warranted Under the 3553(a) Factors.

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in §3553(a) to determine whether a sentencing reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). As currently scheduled, the BOP expects to release Mr. Ramirez April 29, 2022.

As detailed in Defendant's Sentencing Memo, Mr. Ramirez' history and characteristics further support this request. He has no history of violence and he fell into the lowest criminal history category allowed by the sentencing guidelines – Criminal History Category I. As demonstrated through the letters of support submitted prior to his sentencing and the overwhelming number of family and friends who came to Court to support him, it is clear that Mr. Ramirez has a strong support network to help him assimilate into society. While the deterrent factors that led the Court to impose a sixty six month incarcerative sentence at the time were understandable, the situation has drastically changed. A sentence reduction is warranted under the § 3553(a) factors.

---

[29] If this Court holds that it cannot waive the 30-day exhaustion requirement, it may also grant this motion immediately after the 30 days has elapsed, i.e. on May 2, 2020. *See, e.g., United States v. Spears*, 2019 WL 5190877 at * 3 (D. Or. Oct. 15, 2019) (noting that Spears presented his request to the BOP on September 13, 2019, the same day he filed his motion with the Court. The 30-day period expired October 13, 2019. The Court granted the motion on October 15, 2019, the first business day after October 13, 2019).

**CONCLUSION**

For the foregoing reasons, Mr. Ramirez respectfully requests that the Court grant a

reduction in his sentence to time served followed by 5 years of supervised release.

Respectfully submitted,

JAMES RAMIREZ,
By His Attorney,

*/s/ Stylianus Sinnis*
Stylianus Sinnis, BBO #560148
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th
Floor Boston, MA 02210
617-223-8061

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-registered participants on April
9, 2020.

*/s/ Stylianus Sinnis*

Stylianus Sinnis