UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                                        )    CRIMINAL ACTION
               v.                       )    No. 17-10328-WGY
                                        )
JAMES RAMIREZ,                          )
                                        )
               Defendant.               )
_____)

YOUNG, D.J.                                          May 12, 2020

**MEMORANDUM**

## I.   ANALYSIS

### A. Legal Standard

On April 24, 2020, this Court resentenced James Ramirez under its power to grant compassionate release. <u>See</u> Electronic Clerk's Notes, ECF No. 119; Order, ECF No. 120. Ramirez is the first prisoner to whom this Court has granted compassionate relief since the passage of the First Step Act of 2018, Pub, L. No. 115-391, ch. II(D) § 3582(c)(1)(A), 132 Stat 5239-5241 (2018), which grants prisoners the right to appeal denials of compassionate relief made by the Bureau of Prisons ("BOP"). 18 U.S.C. § 3582(c)(1)(A). Prior to the passage of the First Step Act, district courts could grant a request for compassionate relief only upon motion of the Director of the Bureau of Prisons (the "Director"). <u>See</u> <u>United States</u> v. <u>Beck</u>, 2019 U.S. Dist.

1

LEXIS 108542, at *11 (M.D.N.C. June 28, 2019) (citing Pub. L. No. 98-473, ch. II(D) § 3582(c)(1)(A), 98 Stat. 1837 (1984)); Green v. Apker, No. 5:13-HC-2159, 2014 U.S. Dist. LEXIS 94376, at *5 (E.D.N.C. July 11, 2014).  The First Step Act now allows federal courts, as well as the Director, to reduce the term of imprisonment "upon motion of the defendant" if the defendant has exhausted all administrative rights, or upon "the lapse of 30 days from receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ."  18 U.S.C. § 3582(c)(1)(A).

For a defendant under 70 years of age, a court may grant compassionate release only if "extraordinary and compelling reasons warrants such a reduction," and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  Id.  A court must also consider the general sentencing factors contained in 18 U.S.C. § 3553.  Id. These factors include the nature and circumstances of the offense and defendant, the necessity of the sentence to reflect the seriousness of the offense, deter other criminals, and protect the public, the kind of sentences available, and the need to avoid unwarranted sentencing disparities.  18 U.S.C. § 3553(a).

Ramirez's request for compassionate release is motivated in part by the COVID-19 pandemic that has spread like wildfire

throughout the world, and in part by his medical vulnerability.
See Def.'s Mot. Reduce Sentence Pursuant 18 U.S.C. §
3582(c)(1)(A) ("Def.'s Mot."), ECF No 111.  COVID-19 is
particularly contagious in prisons because inmates are forced
into close quarters without access to personal protective
equipment.  See Savino v. Souza, No. 20-10617-WGY, U.S. Dist.
LEXIS 61775, at *5-6 (D. Mass. Apr. 8, 2020) (discussing COVID-
19 risk to detainees in ICE facility); Centers for Disease
Control and Prevention, Social Distancing, Quarantine, and
Isolation, https://www.cdc.gov/coronavirus/2019-ncov/prevent-
getting-sick/social-distancing.html (last accessed Apr. 29,
2020) (advising people to maintain a distance of at least six
feet from each other in order to reduce the spread of the
disease).  New York, where Ramirez is imprisoned in the
Metropolitan Detention Center (MDC), Brooklyn facility, is the
hardest-hit state in the United States as of the time of this
writing.  See Centers for Disease Control and Prevention, Cases
in the U.S., https://www.cdc.gov/coronavirus/2019-ncov/cases-
updates/cases-in-us.html (last accessed Apr. 30, 2020)
(reporting 290,481 COVID-19 cases and 22,275 deaths in the state
of New York).

The questions in Ramirez's case are whether the risk of
contracting the coronavirus, given his medical history, is the
type of "extraordinary and compelling circumstance" that

warrants compassionate relief, and whether this Court may waive the 30-day requirement of section 3582(c)(1)(A).  This Court answers both questions in the affirmative.

### 1.   Availability of Relief under 18 U.S.C. § 3582

Ramirez's case differs from typical requests for compassionate release prior to the passage of the First Step Act because he seeks release due in part to an external threat, the COVID-19 virus, rather than solely due to an existing internal medical condition.

Such a request is outside the traditional grounds for compassionate release under U.S.S.G. § 1B1.13, the policy statement that governs motions filed by the Director under section 3582(c)(1)(A).  Beck, 2019 WL 2716505, at *4.  The official commentary provides that extraordinary or compelling reasons for relief can consist of: (1) the medical condition of the defendant; (2) the age of the defendant; or (3) the family circumstances of the defendant.   U.S.S.G. § 1B1.13 cmt. n.1. The description of medical conditions that warrant relief is particularly restrictive, including only terminal illness or serious deterioration that "substantially diminishes" the ability of the defendant to provide self-care and "from which he or she is not expected to recover." Id. cmt. n.1(A).  The commentary also provides a catch-all provision, allowing for release upon consideration of another "extraordinary and

compelling reason" as determined by the Director.  Id. cmt.

n.1(D).  In practice, the Bureau of Prison's ("BOP") criteria

for release are far more restrictive than authorized by the

guidelines.  See Bureau of Prisons, U.S. Department of Justice,

Program Statement 5050.49 (2013); Office of the Inspector

General, U.S. Department of Justice, The Impact of an Aging

Inmate Population on the Federal Bureau of Prisons ("Impact

Study") 41-46 (2015).[1]

District courts have debated whether, after the First Step

Act, the Director remains the sole arbiter of the catch-all

provision that allows "other" factors to be considered in

release.  Compare United States v. Cantu, 423 F. Supp. 3d 345,

349-52 (S.D. Tex. June 17, 2019) (holding that judges, in

addition to the Director, can consider factors other than those

enumerated because the First Step Act superseded the policy

guidelines), with United States v. Lynn, Cr. No. 89-0072, 2019

U.S. Dist. LEXIS 135987, at *6-11 (S.D. Ala. Aug. 12, 2019)

(rejecting the reasoning in Cantu because the preexisting

---

[1] The Office of the Inspector General found in 2013 that the
BOP was granting release only to inmates with less than 12
months to live.  Impact Study 41.  In response to this finding,
the Attorney General instituted the new internal guidelines
contained in Program Statement 5050.49 that allowed the Director
to request relief for inmates over the age of 65 with chronic or
serious medical conditions who have served at least 50% of their
sentence.  Id. at 43.

language of section 1B1.13 1(d) does not directly contradict the First Step Act).

This Court has held that it may consider unlisted factors in deciding whether extraordinary and compelling circumstances exist because such an interpretation best comports with the First Step Act.  See United States v. Bucci, 409 F. Supp. 3d 1, 1-2 (D. Mass. 2019).  This Court agrees with Judge Hornby of the District of Maine that "[t]he First Step Act did not change the statutory criteria for compassionate release, but it did change the procedures, so that the Bureau of Prisons is no longer an obstacle to a court's consideration of whether compassionate release is appropriate." United States v. Fox, No. 2:14-CR-03-DBH, 2019 U.S. Dist. LEXIS 115388, at *5 (D. Me. July 11, 2019). The language of the comment that refers to the "Director of the Bureau of Prisons" is best understood as reflecting the procedure in place at the time of its writing, rather than a substantive restriction.  See Bucci, 409 F. Supp. at 2.

The policy contained in section 1B1.13 serves as "helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive." Id. (quoting Fox, 2019 U.S. Dist. LEXIS 115388, at *4); see also Beck, 2019 U.S. Dist. LEXIS 108542, at *14-16, *22-25, United States v. Brown, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019), amended, 2020 WL 2091802 (S.D. Iowa Apr. 29, 2020).  As the threat from the

coronavirus post-dates both section 1B1.13 and the First Step
Act, and this Court has the authority to consider other relevant
factors, it must now look beyond the policy language in
determining if "extraordinary and compelling reasons" exist.

### 2.   Extraordinary and Compelling Reasons

Ramirez is neither the first nor the last inmate to request
release in the face of the COVID-19 pandemic, so this Court
first considers the extent to which the pandemic justifies
release in general.

This Court's ability to exercise its discretion is not
constrained by the language of section 3582(c)(1)(A).  See
Cantu, 423 F. Supp. 3d at 352.  To guide their discretion,
however, courts should grant relief under the catch-all
provision only if the inmates' circumstances are "comparable or
analogous to what the Commission has already articulated as
criteria for compassionate release."  Fox, 2019 U.S. Dist. LEXIS
115388, at *7.  The most relevant guidance from the Commission
comes from section 1B1.13, cmt. n.1(A)(ii), which allows for
medical release when "[t]he defendant is . . . suffering from a
serious physical or medical condition . . . that substantially
diminishes the ability to provide self-care within the
environment of a correctional facility and from which he or she
is not expected to recover."  Even when prisoners' circumstances
fall within the guidelines, a grant of compassionate release is

a "rare event." United States v. Willis, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (listing cases).  Yet worldwide pandemics are a rare event as well.

Other courts have held that the threat of COVID-19 alone is not sufficient to allow release.  For example, a court in the Western District of Virginia denied compassionate release to an inmate in part because he failed to show he suffered from a medical condition that made him particularly susceptible to COVID-19.  See United States v. Dungee, 2020 U.S. Dist. LEXIS 59511, at *5 (W.D.V.A. Apr. 4, 2020).  Similarly, in United States v. Khawaja the district court found that the threat of COVID-19 to an inmate with mere "breathing difficulties" did not merit compassionate release under either the section 1B1.13 enumerated medical criteria or the catch-all provision.  No. 18-cr-127-LM, 2020 U.S. Dist. LEXIS 70273, at *14 (D.N.H. Apr. 22, 2020); see also United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release . . . ."); United States v. Eberhart, No. 13-cr-00313-PJH-1, 2020 U.S. Dist. LEXIS 51909, at *7 (N.D. Cal. Mar. 25, 2020) (applying the policy guidelines in section 1B1.13 and holding that "[g]eneral concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a

reduction in sentence"). Even when prisoners have identified medical conditions that place them at heightened risk from the disease, courts have denied compassionate release absent a showing the disease existed in the particular facility. See, e.g., United States v. Feiling, No. 3:19cr112 (DJN), 2020 U.S. Dist. LEXIS 64428, at *21 (E.D. Va. Apr. 10, 2020).

These holdings reflect the clear language and intent of section 3582. COVID-19 may be an extraordinary circumstance that potentially threatens all inmates, but compassionate release is an "extraordinary" remedy. See 18 U.S.C. § 3582(c)(1)(A). Because this remedy is "extraordinary," it should be applied only to inmates whose situation is "particularized" as defined in the policy guidelines. See Feiling, 2020 U.S. Dist. LEXIS 64428, at *21; see also Bucci, 409 F. Supp. 3d at 2 (granting compassionate release for the sole available caregiver of an aging parent, in accordance with section 1B1.13 cmt. n.1(C)(ii), but citing States v. Ingram, No. 2:14-cr-40, 2019 U.S. Dist. LEXIS 118304, at *4-5 (S.D. Ohio July 16, 2019) as denying compassionate relief to another inmate with a sick mother because "(m)any, if not all inmates, have aging and sick parents"). Allowing any inmate under threat of the coronavirus to receive compassionate release would untether a judge's discretion from the policy guidelines because it would transform

an extraordinary remedy into an ordinary one.  Fox, 2019 U.S. Dist. LEXIS 115388, at *7.[2]

Where particularized conditions do exist, compassionate release is more appropriate.  Since the beginning of the coronavirus crisis, numerous courts have granted compassionate release to inmates who suffer from serious medical conditions that make them particularly vulnerable to the virus.  See, e.g., United States v. Atwi, No. 18-20607, 2020 U.S. Dist. LEXIS 68282 (E.D. Mich. Apr. 20, 2020) (latent tuberculosis); United States v. Joling, No. 6:11-CR-60131-AA, 2020 WL 1903280 (D. Or. Apr. 17, 2020) (cancer, hypertension, and obesity); United States v. Perez, No. 17 Cr. 513-3 (AT), 2020 U.S. Dist. LEXIS 57265 (S.D.N.Y. Apr. 1, 2020) (reconstructive surgery following an altercation); United States v. Campagna, No. 16 CR. 78-01 (LGS),

---

[2] Inmates ineligible for compassionate release, fearing infection from the coronavirus, may still have recourse to challenge their confinement if conditions in their facility create a substantial risk of serious harm from the virus, and the ineffectiveness of the response from prison officials rises to the level of deliberate indifference.  See, e.g., Estelle v. Gamble, 429 U.S. 97, 104 (1976); Parsons v. Ryan, 754 F.3d 657, 677 (9th Cir. 2014).  District courts around the country have considered such requests, and the Sixth Circuit recently declined to stay a preliminary injunction granting relief to certain prisoners challenging their confinement under the Eighth Amendment.  See Wilson v. Williams, No. 20-3447, 2020 U.S. App. LEXIS 14291 (6th Cir. May 4, 2020) (denying stay of preliminary injunction issued in Wilson v. Williams, No. 4:20-cv-00794, 2020 U.S. Dist. LEXIS 70674 (N.D. Ohio Apr. 22, 2020).

2020 U.S. Dist. LEXIS 54401 (S.D.N.Y. Mar. 27, 2020) (compromised immune system).

The reasoning from Perez is instructive.  In evaluating whether to order release of an inmate recovering from surgery, the court pointed to the guidance from section 1B1.13 that modification of a sentence may be appropriate when "[t]he defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." 2020 U.S. LEXIS 57265, at *9 (alteration and omissions in original) (quoting § 1B1.13 cmt. n.1).  The court reasoned that, confined to his cell and suffering serious debilitation from the surgery, the inmate "cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus."  Id. at 10; see also Campagna, 2020 U.S. Dist. LEXIS 54401, at *8-9 (holding that a defendant's compromised immune system in the context of the pandemic "diminishes his ability to provide self-care within the environment of the [facility].")

This Court follows Perez and Campagna in holding that compassionate release can be available to inmates who show they suffer from serious medical conditions that diminish their ability to provide self-care in the environment of a facility.

11

The BOP acknowledges that many patients with a severe case of the disease will be debilitated to the point that they are incapable of self-care.  See United States v. Gotti, No. 02-CR 743-07, 2020 U.S. Dist. LEXIS 8612, at *10-11 (S.D.N.Y. Jan. 15, 2020) (citing Federal Bureau of Prisons, U.S. Department of Justice, Program Statement 50.50 ("PS 50.50") 5 (2019)).  PS 50.50 indicates the BOP will consider release for a prisoner with an incurable or debilitating illness who is "[c]apable of only limited self-care and is confined to a bed or chair more than 50% of waking hours."  PS 50.50, at 5.  Patients with severe infections are likely to be hospitalized and bedridden for up to two weeks, and even many who survive will require extreme interventions such as admittance to an Intensive Care Unit, rendering them completely incapable of self-care.[3]

Many of the inmates to whom other courts have granted compassionate release would not qualify as having "serious" conditions under the definitions provided by the BOP, but this is not an obstacle.  See PS 50.50, at 4-5 (allowing for

---

[3] See Centers for Disease Control and Prevention, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) (Apr. 3, 2020) (available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html) (reporting statistics indicating a hospitalization rate of 19% for those with a preexisting condition, that the median hospital stay for recovered patients was 10-13 days, and that 26-32% of those hospitalized were admitted to the ICU).

compassionate release for inmates who have a terminal illness,
defined as one with a life expectancy less than 18 months, or a
debilitating medical condition, defined as incurable,
progressive, and from which they will not recover).  Courts are
not completely constrained by the guidelines; we are free to
consider other factors such as the risk of inmates developing a
serious condition.  See Atwi, 2020 U.S. Dist. LEXIS 68282, at
*14 ("[I]f [the inmate] does catch it, the risks to someone with
a co-infection of [tuberculosis] and COVID-19 are 'readily
apparent' . . . .  The Court is not willing to take that
risk.").  The risk of a debilitating or fatal outcome for those
with preexisting conditions is very high.  Data from U.S.
hospitalizations in March indicates that those with preexisting
conditions who catch the coronavirus are three times as likely
to be hospitalized, and six times as likely to be admitted to
the ICU, as those without.[4]  Conversely, the vast majority of
patients with severe outcomes had a preexisting condition.[5]

---

[4] CDC COVID-19 Response Team, Preliminary Estimates of the
Prevalence of Selected Underlying Health Conditions Among
Patients with Coronavirus Disease 2019 — United States, February
12–March 28, 2020, 69(13) Morbidity & Mortality Weekly Report
382, 383 (Apr. 3, 2020) (finding that hospitalization rates were
27.3-29.8% for those with preexisting conditions versus 7.2-7.8%
for those without, and that ICU admission rate was 13.3-14.5%
for the first group versus 2.2-2.4% for the second).
    [5] Shikha Garg et al., Hospitalization Rates and
Characteristics of Patients Hospitalized with Laboratory-
Confirmed Coronavirus Disease 2019, 69(15) Morbidity & Mortality
Weekly Report 458, 459 (Apr. 8, 2020) (reporting that 89.3% of

Additionally, a recent study of a Georgia hospital found that 37.5-48.7% of those admitted to the ICU succumbed to the illness.[6]  Given the extraordinary risk, the BOP's requirement that an illness be "terminal" or "incurable" takes on a new meaning: for a substantial subset of patients, COVID-19 is both terminal and incurable.

Thus, this Court rules that compassionate release may be available for those at a particularly high risk from the coronavirus, provided their release is otherwise appropriate under the section 3553 factors.  See 18 U.S.C. § 3582(c)(1)(A).  This approach is grounded in the language of the section 1B1.13 policy guidance, as it applies only to those inmates who can make a particularized showing of both individual susceptibility to the virus and a high risk of contracting it due to the conditions in their facility.  See United States v. Edwards, No.

---

adults hospitalized in the U.S. for treatment of COVID during the month of March had underlying medical conditions).

[6] Jeremy Gold et al., Characteristics and Clinical Outcomes of Adult Patients Hospitalized with COVID-19 — Georgia, March 2020, 69 Morbidity & Mortality Weekly Report 1, 3-4 (Apr. 29, 2000) (finding also that case fatality rates for hospitalized patients in the sample was 3.7% for those 18-49 years of age, 9.8% for those 50-64 years of age, and 35.6% for those older than 65).

The Court observes that all of the above data is preliminary.  Epidemiological studies, particularly in the current crisis, are subject to numerous confounding factors such as the availability of underlying data and the makeup of available samples.  Additionally, all these studies were able to draw data only from March or earlier.

6:17-CR-00003, 2020 WL 1650406, at *5 (W.D. Va. Apr. 2, 2020).

Yet, in the current case, there is an additional barrier in that

Ramirez sought relief without allowing the BOP 30 days to

respond to his request.  See 18 U.S.C. § 3582(c)(1)(A); Def.'s

Mot.  This Court nonetheless has the authority to waive the

statute's exhaustion requirement, and will now explain why it

did so.  See Order, ECF No. 115.

### 3.    The Exhaustion Requirement

Prior to the hearing at which this Court resentenced

Ramirez, ECF No. 119, the government argued that the Court

lacked the ability to order compassionate relief because Ramirez

had not satisfied the mandatory 30-day requirement of section

3582(c)(1)(A).  Opp'n United States Def.'s Emergency Mot. Reduce

Sentence ("Gov't's Opp'n") 2, ECF No. 113.  The government

points out that Ramirez filed his motion eleven days after

submitting his request to the Warden of the MDC, and that

section 3582(c)(1)(a) plainly states that a Court may consider a

defendant's motion only if the defendant has fully exhausted all

administrative appeals, or upon the lapse of 30 days from the

receipt of the request by the warden, whichever is earlier.  Id.

at 3.  The government further argues that this Court does not

have the "inherent authority" to modify a sentence, for that

authority is granted by section 3582, and the language of the

statute does not allow for an exception to the exhaustion

requirement.  Id. at 3-5 (quoting United States v. Cunningham,
554 F.3d 703, 708 (7th Cir. 2009) and citing Ross v. Blake, 136
S. Ct. 1850, 1857 (2016)).

### a.  Subject Matter Jurisdiction

Though the government mentions the issue only in passing,
as a threshold matter this Court must decide whether the
exhaustion requirement is jurisdictional.  See id. at 4 (citing
United States v. Lepore, 304 F. Supp. 2d 183, 191 (D. Mass.
2004) ("Whereas judicially imposed exhaustion requirements are
prudential and subject to a number of exceptions, statutory
requirements are jurisdictional, and absent statutory
specification, are subject to very few exceptions.").  Federal
courts are courts of limited jurisdiction and must ascertain
whether they have subject matter jurisdiction in order to
consider a case.  See Cusumano v. Microsoft Corp., 162 F.3d 708,
712 (1st Cir. 1998).  Statutes that contain exhaustion
requirements may be either jurisdictional -- controlling a
court's ability to adjudicate a case -- or claims-processing
rules that merely codify the requirements for the petitioner to
assert a claim.  See Reed Elsevier, Inc. v. Muchnick, 559 U.S.
154, 161 (2010).  If the exhaustion requirement is
jurisdictional it cannot be waived because "[s]ubject-matter
jurisdiction can never be waived or forfeited." Gonzalez v.
Thaler, 565 U.S. 134, 141 (2012).

The First Circuit has not yet ruled whether section 3582 is jurisdictional.  See United States v. Lugo, No. 2:19-cr-00056-JAW, 2020 U.S. Dist. LEXIS 63673, at *7 (D. ME. Apr. 10, 2020).[7] Prior to the coronavirus crisis, circuit courts were split on the issue.  See United States v. Spears, 824 F.3d 908, 912-16 (9th Cir. 2016) (holding the statute to be jurisdictional), United States v. Spaulding, 802 F.3d 1110, 1124 (10th Cir. 2015) (same), United States v. Garcia, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (same); United States v. Taylor, 778 F.3d 667, 671 (7th Cir. 2015) (holding the statute is not "phrased in jurisdictional terms").  District courts within this circuit are themselves split.  Compare United States v. Miamen, Nos. 18-130-1, 18-137-3, 18-142, 2020 U.S. Dist. LEXIS 67794, at *8-9 (D. R.I. Apr. 17, 2020), with United States v. Soto, No. 18-cr-10086 2020 U.S. Dist. LEXIS 67912, at *6-8 (D. Mass. Apr. 17, 2020) (Talwani, J.).

This Court joins Judge Talwani in holding that the exhaustion requirement of section 3582(c)(1)(a) is not jurisdictional.  The legislature often includes clear

---

[7] Lugo notes that the First Circuit has approvingly quoted language from the Seventh Circuit that implies section 3582 may be jurisdictional, but this quotation was dicta in a decision addressing the jurisdictional nature of Federal Rules of Criminal Procedure 35, not section 3582.  2020 U.S. Dist. LEXIS 63673, at *7-8 (citing United States v. Griffin, 524 F.3d 71 (1st Cir. 2008)).

jurisdictional limits in a statute, but "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." Arbaugh v. Y & H Corp., 546 U.S. 500, 516 (2006); see also Nkihtaqmikon v. Impson, 503 F.3d 18, 33 (1st Cir. 2007) ("Exhaustion of administrative remedies is a jurisdictional requirement only when Congress clearly ranks it as such.").

The language of section 3582(c)(1)(a) does not contain the "sweeping and direct language that would indicate a jurisdictional bar rather than a mere codification of administrative exhaustion requirements." Casanova v. Dubois, 289 F.3d 142, 146 (1st Cir. 2002) (internal citations omitted); cf. Arbaugh, 546 U.S. at 514-15 (pointing to the amount-in-controversy requirement for diversity-of-citizenship jurisdiction under 28 U.S.C. § 1332 as the exemplar of clear jurisdictional grant). Instead, as Taylor points out, section 3582 is not part of the jurisdictional portion of the criminal code, nor does it speak in specifically jurisdictional terms. 778 F.3d at 671.

Additionally, the Seventh Circuit in Taylor notes that the Supreme Court has considered a parallel issue, whether section 3582(c)(2) (which governs a defendant's petition to reduce his sentence when the guidelines were lowered after his sentencing) was available to a defendant who had entered a binding plea

agreement, and none of the Justices made mention of a jurisdictional requirement in the statute in their opinions. Id. (citing Freeman v. United States, 564 U.S. 522 (2011)).  The court in Taylor reasoned that if section 3582 were jurisdictional the Supreme Court would have said as much given its commitment to clearly identifying jurisdictional rules.  Id. (citing Thaler, 565 U.S. at 140-144; Reed Elsevier, 559 U.S. at 160-62; Arbaugh, 546 U.S. 500; Kontrick v. Ryan, 540 U.S. 443, 455 (2004)).  Judge Talwani relied in part on the reasoning in Taylor in ruling that she had jurisdiction, and further noted that the circuits which have found section 3582 to be jurisdictional were not dealing specifically with the exhaustion requirement.  Soto, 2020 U.S. Dist. LEXIS 67912, at *7.  The Third Circuit, the sole circuit court to deny (or consider) a coronavirus request for compassionate release because of the exhaustion issue, did not mention jurisdiction.  See Raia, 954 F.3d 594 (3d Cir. 2020).

Thus, this Court is confident there is no binding precedent that dictates it does not have subject matter jurisdiction over Ramirez's case.  In the absence of clear language to the contrary in section 3582, it rules that it has subject matter jurisdiction despite the lack of exhaustion.

### b.  Waiver of the Thirty-Day Requirement

Even if section 3582 is not jurisdictional, it does bar judicial review when a defendant has not exhausted his administrative rights, or when 30 days have not elapsed since the submission of the petition to the prison warden.  See 3582(c)(1)(a).  Ramirez argues this Court should nonetheless waive the 30-day requirement because of the urgent threat of the coronavirus.  Def.'s Mot. 24.  The Court holds it has the discretion to waive the requirement and does so in these extraordinary circumstances.

Waiver of the exhaustion requirement is not unprecedented during this time of crisis.  Some district courts have waived the requirement, even for those defendants with significant amounts of time left on their sentence.  See Soto, 2020 U.S. Dist. LEXIS 67912; United States v. Zukerman, No. 16-cr-194, 2020 U.S. Dist. LEXIS 59588 (S.D.N.Y. Apr. 3, 2020); United States v. Haney, No. 19-cr-541, 2020 U.S. Dist. LEXIS 63971 (S.D.N.Y. Apr. 13, 2020).  Other courts have declined to waive the exhaustion bar, often requiring defendants to refile their complaints after the 30-day period had elapsed.  See United States v. Crosby, No. 17-cr-00132, 2020 U.S. Dist. LEXIS 74494, at *5 (D. Me. Apr. 28, 2020); Lugo, 2020 U.S. Dist. LEXIS 63673 at *8-11.

The language of the statute appears at first to be "clear and mandatory" in requiring exhaustion.  Id. at *8.  The

government correctly points out that the statute does not
contain language softening the exhaustion requirement, as is
found in the Prison Litigation Reform Act ("PLRA").  Gov't's.
Opp'n 5 n.1 (citing Ross v. Blake, 136 S. Ct. 1850, 1856-58
(2016) (noting that the PLRA's exhaustion requirement included
language indicating it applied so long as administrative
remedies were "available")).   The government also cites First
Circuit precedent and a decision of this Court for the
proposition that statutory requirements are more rigid than
judge-made law, and are subject to very few exceptions.  Id. at
4 (citing Sousa v. INS, 226 F.3d 28, 31 (1st Cir. 2000); Lepore,
304 F. Supp. 2d at 191).

Yet there are narrow circumstances where a seemingly clear
statutory exhaustion requirement is subject to these "few
exceptions." Lepore, 304 F. Supp. 2d at 192.  In determining
whether an exhaustion requirement is waivable, "Congressional
intent is 'paramount.'" Haney, 2020 U.S. Dist. LEXIS 63971, at
*7 (quoting McCarthy v. Madigan, 503 U.S. 140, 144 (1992)).
Judge Rakoff's analysis in Haney is helpful in determining this
congressional intent.  Judge Rakoff notes that section 3582 does
not contain a traditional exhaustion requirement (such as full
litigation of a claim before the agency), but instead requires
defendants "either to exhaust administrative remedies or simply
to wait 30 days" before filing a motion.  Id. at *8 (emphasis in

21

original).   Judge Rakoff explains that the 30-day requirement is
far shorter than the exhaustion requirement of other statutes
designed to force a petitioner to go through full agency review,
and that this short timeline therefore reflects congressional
intent to provide a "meaningful and prompt judicial
determination" when the BOP does not or cannot provide that
prompt determination.   Id. at *9 (quoting United States v.
Russo, No. 16-cr-441 (LJL), 2020 U.S. Dist. LEXIS 59223, at *7
(S.D.N.Y. Apr. 3, 2020)).   "This alternative to exhaustion
suggests that Congress understood that some requests for relief
may be too urgent to wait for the BOP's process."   Soto, 2020
U.S. Dist. LEXIS 67912, at *12.   Judge Liman in Russo further
explained this reasoning: "at the time the First Step Act
passed, a 30-day period before which to seek judicial review
would have seemed exceptionally quick . . . .   In essence, the
30-day rule was meant as an accelerant to judicial review."
2020 U.S. Dist. LEXIS 59223, at 7.   Indeed, in the short time
between the passage of the First Step Act and the beginning of
the crisis, the BOP (at least within the First Circuit) has
struggled to provide a response to compassionate release
petitions within 30 days, and that was before the deluge of
requests associated with the coronavirus.[8]

---

[8] This Court conducted a survey on LexisNexis of cases in
the First Circuit dealing with compassionate release under the

The leading case that would potentially contradict this analysis is Ross, in which the Supreme Court, while examining the PLRA, held that it did not contain an exception to exhaustion for "special circumstances."  136 S. Ct. at 1856.  In analyzing the statute, the Court explained that the language of the PLRA provided for no exception, and "that mandatory language means a court may not excuse a failure to exhaust."[9]  Id.  Unlike section 3582(c)(1)(a), the PLRA includes an ironclad exhaustion requirement instead of allowing judicial review after a short waiting period.  See 42 U.S.C. § 1997e(a).[10]  The Supreme Court in Ross read this language as reflecting Congress's intent to require exhaustion.  136 S. Ct. at 1857 ("Congress sets the

---

First Step Act in 2019, before the coronavirus spread to the United States.  There were three cases (out of five total) in which the district court found the defendant had shown administrative exhaustion, and in only one of them had the warden responded to the defendant's request within 30 days.  See Mot. Reduce Sentence Pursuant First Step Act 7, Bucci, No. 1:04-cr-10194 (D. Mass Aug. 7, 2019) (response after 28 days); Mot. Reduce Sentence re: First Step Act 15, 16, United States v. Estrella, No. 2:15-cr-00032 (D. Me. Oct. 15, 2019), ECF No. 23 (response after 57 days); Mot. Reduce Sentence re: First Step Act 1, 4, Fox, No. 2:14-03 (D. Me. May 10, 2019) (no response within 38 days).

[9] The relevant language from the PLRA is as follows: "No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e.

[10] The exception under the PLRA, the Supreme Court noted, is when a remedy is not "available," 136 S. Ct. at 1859, but section 3582 contains no such language.

23

rules —- and courts have a role in creating exceptions only if
Congress wants them to.").  In section 3582(c)(1)(a), in
contrast, the exhaustion requirement of the statute indicates a
desire on the part of Congress to accelerate review rather than
hinder it, so Ross would not preclude applying an exception.

The COVID-19 crisis is the kind of situation where an
exception to the exhaustion requirement applies.  The First
Circuit has held that a court may waive an exhaustion
requirement "where a resort to the agency would be futile
because the challenge is one that the agency has no power to
resolve in the applicant's favor."  Sousa, 226 F.3d at 32.  In
the current crisis, where the coronavirus can enter a prison and
spread undetected, a wait of even 28 days as occurred in Bucci
would render futile any attempt by the BOP to "resolve" a
compassionate release request "in the applicant's favor" because
the defendant may have already been exposed to the virus.  This
is factual futility, rather than the legal futility considered
in Sousa, 226 F.3d at 32, but the same reasoning applies in
light of the congressional intent of the First Step Act to
expand and effectuate compassionate release.  See Soto, 2020
U.S. Dist. LEXIS 67912, at *12-13.

This Court therefore has the discretion to waive the 30-day
exhaustion requirement contained in section 3582(c)(1)(a) and
does so for Ramirez.

## II. THE PRESENT CASE

James Ramirez is a 57-year-old man suffering from diabetes with nephropathy, hypertension, and high cholesterol.  Def.'s Mot. 1.  At the time of resentencing he had served 43 months of his 66-month sentence for distribution of fentanyl.  Id. at 1-2.  He has no history of violence and his criminal history score is I.  See Statement of Reasons, ECF No. 110.  When he submitted his application for compassionate release, two prisoners and nine staff had already tested positive for coronavirus at MDC Brooklyn.  Def.'s Mot. 1.

## III. CONCLUSION

Applying the analysis above to the undisputed facts of this case, this Court granted compassionate release with an extended period of supervised release and strict conditions.

**BY THE COURT.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE